Thank you, Your Honors. And please, the Court, Alan Hyman for the appellate Michael Hitz. First argument up is the attorneys, the Court was erroneous when the Court said, plaintiffs, plural, blindly alleged without first checking to ensure they had the requisite standing. There were two plaintiffs, Mr. Magnus, the assignor, Michael Hitz, the company who was the assignee. Michael Hitz received an assignment in 2009, received another assignment in 2009, checked the Copyright Office, did not see anything inconsistent, obtained a copyright registration, saw no paramount agreement, saw no registration for the sound recording, and thereafter was a good-faith purchaser for value without knowledge. And there was evidence without question, this is in tab 12-106, that we put in that the defendants were willful infringers, tab 12-106, tab 12-108 of the expert report that shows duplicate, absolutely duplicate sound between the two recordings, that they were willful infringers. The defendants say in their brief at page 9, Deep Dish commissioned a report by a renowned musicologist. Deep Dish did not have the opportunity to submit the report because of the voluntary dismissal. So there is no dispute as to the evidence of a willful infringement, no dispute as to Michael Hitz being different than Magnus as the purchaser and the plaintiff. The Court says, again, tab 1, here plaintiffs blindly allege that they owned 100%. Michael Hitz did not blindly allege. Michael Hitz was a good-faith purchaser for value. It does not serve the interest of the Copyright Act. Purchaser of what? Purchased the interest in the sound recording. He purchased 100% of Shandy's Cinnamons at 16-185 on May 25, 2009. He purchased, he purchased from, he purchased. Why did you dismiss the case? Well, the attorney at the time, the attorney at the time thought they didn't have standing. They come up with this document. He not only thought that, he affirmed to the Court. He stated that, yes. Right. And you said that's not binding on you? Could be, could not be, omission, possibly so. That's what he said. And they were, he was one, all he had to do was record the assignments. He had standing. That's all he had to do was record the assignments. And they didn't record the assignment until after the judgment, admittedly. We recorded them on February 23rd. The first date I came into the case. And, but it does not serve the Copyright Act when someone who's an innocent party who buys the sound recording copyright, gets his own registration, does a search, finds nothing in the record, and, and then is, then the people who are willful infringers seek attorney's fees. That does not advance the interest of the Copyright Act. And that's what happened here. And I'm just saying that the Court's statement here, plaintiffs blindly allege in the complaint they owed 100 percent. Mikrohitz, as opposed to the magnus, the, the author, did not blindly assert he owed 100 percent. He appropriately asserted he owed 100 percent. What, what did he have by way of evidence that, in fact, the seller had the rights that he, that he put to convey? He, well, he searched the Copyright Office. He did not see any sound recording copyright for this thing other than the soundtrack copyright, which was for remixing only. He had evidence that there was, in his application to the Copyright Office, he had evidence that they were the, Shandy Cinnamon was the singer on the sound recording, the other person was the producer on the sound recording, that they created it before, months before the, the motion picture in 1983. This is all in the declaration, in the declarations of, and that they actually had cassette tapes of what they put out and what they sold. So you have two people come to you and say, I assign this to you, I assign it to you, I give you 100 percent of the rights. He has no 17 U.S.C. 205D says, someone who takes in good faith, purchase her for value without knowledge of a prior assignment prevails, if he's first to record. He was a good faith purchaser for value without knowledge of a prior assignment, a prior assignment that was rickety and fraudulent and so forth and so on in the first instance, and he recorded at the time of the award of the attorney's fees, he has standing, he was the owner of the rights, and the courts finding plaintiffs blindly, which joined Michael Hitz and Magnus, is improper. I'd like to move on to whether the notice of withdrawal was untimely. The court found, the court found, oh, yes, and we also feel that the 32,427.50 awarded to Mr. Naziri was improper. Now, he comes in and makes a pro hoc each application after the judgment to be admitted and then doesn't submit contemporary in his time records. The withdrawal was timely. Well, I'll put it this way. It's a serious, serious issue that the court finds the court does not have to warn them and give them notice of the right to withdraw. I think that's an erroneous finding by the court. The court refers to the cases of Lau and Beard when the only matter is attorney's fees and then says, listen, I don't have to warn these people, and I don't have to tell them you have a right to withdraw, even though I'm dismissing it with prejudice. I don't have to tell you, and I don't have to tell you you have a reasonable time to withdraw. The court says, I don't have to do that. I didn't have to do that. And I said, yes, the court should have done that and did have the obligation to do that, and whether this ---- Well, didn't he hold a conference? Pardon? Didn't the court hold a conference address? Yes, certainly. So why wasn't that noticed? Because, Your Honor, I've had judges tell me in the middle of trial, several occasions, bench trial, calls the Senate after two days, you're going to lose, A, B, C, D, you don't look good. I don't ---- I'm having trouble with the credibility of your witnesses. And then the next day they call us in and they say, you're going to lose, the other side. And then there's a final judgment on the bench trial. The judge was making preliminary notions. There was no direct determination by the judge which said, listen, I'm giving you notice. I'm going to dismiss this case with prejudice. You have a right to withdraw. Didn't he authorize you to or permit you to brief whether a dismissal with prejudice was appropriate? He went ahead, the person ---- that's right, very good point. He went ahead and he said, the attorney went ahead and said, listen, I want to further brief the fact that the right to withdraw, I want to further brief the fact that dismissal with prejudice is appropriate. And that was the reply brief. And then the court could have said, my intention is to dismiss with prejudice. I mean, that's my final intention. I'm going to dismiss it with prejudice. And I give you 20 days. You can either withdraw or that will be the final judgment. The Ninth Circuit jurisprudence does not state that. It just doesn't state it. And there's confusion in the Ninth Circuit on that nature. I'd like to reserve the 55 seconds I have at the briefing point. Okay. Thank you. Are you splitting time? May it please the Court? I'm sorry. You can't have two lawyers up there at the same time. Are you going to split time? I'm sorry. Are you splitting your time? I may split my time two minutes for Mr. Nassari on registration issues, if the Court's interested. Okay. Well, watch your clock. Sure, I will. No problem, Your Honor. Thank you. May it please the Court, Your Honors? Eric Bjorgum, Karish and Bjorgum in Pasadena for Appellees and Defendants, Deep Dish Productions, Inc. With me is Kourosh Nassari from Washington, D.C., to speak on any registration issues. Your Honors, this case, you know, we just heard a litany of things about things that were submitted 70 days after judgment was entered on this case. This case was ready for trial, and we found the assignment from Paramount that was not produced by the plaintiffs, was not sought by the plaintiffs, because finally we got the deposit copy that was deposited with the Copyright Office, and we knew what they were claiming copyright on right before trial. So Judge Anderson immediately wanted to know what to do about this. This was around, I think, November 5th, November 10th. He holds a conference, and he says he gives the plaintiff an option. Do you want to file a motion to dismiss, or should I enter judgment? And the plaintiff agrees on the record that there's no standing, with the federal judge on the record agrees there's no standing. He files his motion to dismiss on November 15th as an ex parte, giving us only one day to respond. We respond. We ask for a dismissal with prejudice. November 23rd, Judge Anderson holds another conference on the phone, saying, well, they want it with prejudice, you want it without prejudice, what am I going to do? We can go to trial, or we can brief it. That is at tab 26. You can go to trial, or we can brief it. They say, we want to brief it. We don't want to go to trial. Because Judge Anderson says, with no standing, they're going to JNOVU, that's it. They agree. They brief it. They file their brief on December 5th. He gives them another 10 days. He waits a month. Then he issues an order on January 6th, finding the case should be dismissed with prejudice. He issues a judgment on the same day. The defendants, I mean, I'm sorry, the plaintiffs at tab, I'm sorry, at ER 302, specifically say in their reply brief filed November 23rd, if this case is dismissed with prejudice, the court should specify in its order that the dismissal was entered only because plaintiffs could not prove standing. They ask for that. That's the condition they ask for in their brief. That's what Judge Anderson does. He grants them dismissal with prejudice, puts it into judgment. We file a motion for attorney's fees. This is all timely. Within 30 days, they don't ask to amend the judgment. They don't ask for more time to appeal. They don't ask to alter the judgment. None of the rules that they have under Rule 58, 59, Federal Rule of Appellate Procedure 4. Then on November 17th, with new counsel, they file a motion to withdraw. So we're 70 days out from the judgment that says they have no standing. Now, a Federal court judgment has to mean something. They've had 30 days to appeal. The court has said in the judgment they have no standing. The commissioner orders them to brief standing, and we get – all we get is a bunch of new evidence that was submitted 70 days after judgment was entered. And so I think that this Court can easily just say there's no jurisdiction on this case because there's no injury. And with no injury, you can't have jurisdiction, and this Court has to enforce its jurisdiction. Kennedy. And not as to the sanctions, right? I'm sorry, Your Honor? As to the sanctions as well? Well, the sanctions – no, no. You're correct. The sanctions – well, they weren't sanctions. Remember, they were fees under the Copyright Act, which we're entitled to as prevailing parties under Section 17 U.S.C. 505. So we were entitled to that as prevailing parties. You didn't answer my question. You corrected what I said. I'm sorry. Okay. Is there not – and then you didn't answer what – you know, you stopped. I'm sorry. Do you remember the question? Yeah. The order – ordering fees was on August 8th, and the notice of appeal was on August 18th. So the notice of appeal was timely as to the order of fees. That's correct, if that was the question. I didn't know they were – I didn't call them sanctions. I was calling them fees. I know. You corrected them, but you didn't – your answer is there is – we have jurisdiction over that. Yes, I believe so. Okay. So I just want to make clear, because you said there's no jurisdiction we can dismiss. We can't dismiss the whole case. That's true. Okay. You want to talk about the part of the case that you agree is properly before us? I'm sorry. Talk about what? You want to talk about the part of the case that you agree is properly before us? Yes. The part of the case I believe is before us, although I would like to say it is sort of a quandary to admit you don't have standing and then file a brief, but that's a logical issue. The part of the case is – I have no idea what you just said. You just muttered an aside that I have no idea. And I don't know why you would do that. Either you have a point to make to the Court. If you want to talk to yourself, you can do it after court. Is there a point you were trying to make there? The point would be, Your Honor, that once someone has no standing, I question their ability to file another brief. That's my point. I don't understand how the judge actually calculated the fees here. I tried to reproduce it, and I can't do the arithmetic to come out the way he did. Well, is there any – Well, I mean, usually when you get these orders, the load star fee, the judge says the hourly rate is X. Here he said it was, what, 450 or some other number. Ours were 295. And then you multiply it by Y, which is the number of hours, and I can't find Y in his order. He disallows some hours, and I don't ever see where he actually does the calculation where X times Y equals Z. I would – I have to agree with what his order says. We submitted the charts, and then he probably went through those and just ticked things off. I don't know. Maybe that was his thought process, but I don't see anywhere in the order where he says I'm allowing X number of hours. Do you? No, I see reductions of hours based upon what we started with, Your Honor. That's correct. I don't know. And I tried to go through the chart. I deducted the hours that he said he was going to deduct, and I couldn't get it to come out the way he got it to come out. All I can say is that the district court has discretion on that issue, and he spent some time on it. No discretion to make mathematical errors. Sorry? There's no discretion to make mathematical errors. I understand. That's true, Your Honor. I have – Do you want to speak to the question of whether fees were appropriate at all against microhits? Yes, I think they were appropriate. We got all the way ready for trial for $32,000. They buy what's supposed to be a copyright from somebody who has proof that they, in fact, wrote the song. There's nothing on record anywhere. It's not like you can go to the title records or the copyright office or anything to find an assignment or a transfer of the copyright. Your Honor, there were assignments, actually, because they were collateralized in agreements. And where would they have found those? By searching copyright.gov, but the record was closed when they did that, and I respect the rules. Excuse me? In copyright.gov, you can find the other assignments, that these were collateralized in security agreements. There are other assignments out there, but the record was closed. Is that on the record? I mean, I – I don't want to put new things in the record after judgment, Your Honor. Well, I'm just – is there anything in the record that supports what the district court did? You said, you know, they should have known about this. Right. They could have found it. Is this something that is either in the record or – The problem – Of which you could take judicial notice? I mean, how do we – if you're going – if the district court is going to impose sanctions, it is because they brought a lawsuit that they knew or should have known was baseless. Right. Okay. So in order for them to know it's baseless, they have to know or should have known that the people who sold them the copyright didn't have the rights to it. That's correct. Are we on the same page? Yes. Okay. So where does the know or should have known come in on this record? We asked – because this was a soundtrack record that they knew they didn't own. We were asking from day one, what did you deposit? What did you register? We asked for all correspondence – You're talking about micro hits? Yeah. We asked for all correspondence with the Copyright Office. We got one letter which led us down this trail. On the record they submitted at ER-202 is a new letter with the initial application saying they tried to register the actual soundtrack recording and the Copyright Office rejected it. This is on May 2010, after they filed this case. So the whole time we were going through discovery, they were wrangling with the Copyright Office about what to register. At the very end they say, oh, it's a new recording on a cassette that was distributed at shows. And I deposed the guy right before the pretrial conference because he's in the U.K. And he says, there's only one recording. I know there's only one recording. And that's what leads us to go to Paramount and say, okay, there's one recording. It was assigned to Paramount. He thought it reverted to him. He said under depo, it reverted to me. We got the thing from Paramount. This was after the close of discovery when they had not submitted the documents from 202 and 203. We had never seen this correspondence with the Copyright Office. They filed the case without a registration, and we were playing whack-a-mole the whole time. And now here we are again after the judgment. In the court below, both plaintiffs were represented by the same counsel. That's correct. And Mr. Magnus had to know that he had made the assignment because he signed it. That's right. And so I guess the question in my mind is then, is the co-plaintiff having the same counsel held to the same knowledge standard under those circumstances? I would believe so if they filed the case together. It's not anything that I have control over. But unless there's some ambition of fraud. Your personal belief is interesting but not particularly helpful. Do you have any authority? Authority that they are held to the same standard. Judge Rakoff asked you a question, and you said you believe they would be held to the same standard, or they would be held, and you said you believe. I'm not saying your belief is not good enough. Do you have any authority for the idea that if one co-plaintiff has knowledge or has imputed knowledge of something, that that is attributed to the other co-plaintiff because they are represented by the same lawyer? Absent any other proof that there was actual knowledge or that they communicated? I don't have authority other than the ethical duty of an attorney to represent two clients and that they have privilege and they have work ethics. But an ethical duty, that might raise a claim against the lawyer that can hardly be something that is binding on the client. Ethical duties run from lawyer to client, not from client to other client or from client to lawyer, right? That's how ethical duties work. Correct. Right? It would be at best an agency question, right? The lawyer is the agent of both clients. The lawyer is imputed to have the knowledge that one of the clients has. Is that the question I'm raising? Is that then under principles of agency imputed to the other client? In this instance, I would say yes if you look at the correspondence with the Copyright Office on 202-205 because Mr. Besser, the lawyer, was corresponding with the Copyright Office on behalf of both parties who were copied on the e-mails with the Copyright Office who knew what was going on. What was in the correspondence that the Copyright Office said that identified the fact that he's no longer owner of the copyright? What was in the correspondence was the fact that his client, Michael Hicks, tried to register the soundtrack recording and later said that what was registered, what was actually should be deposited was a cassette recording from shows that my client could not have possibly sampled. So he knew that there was a game being played with the deposit copies. Let me ask you a question. When the application for attorney's fees was made by you folks, was there more than one response filed from the other side? You mean the opposition? Did they file a joint response or were there two? Did they file individual responses? They filed – they actually did file individual responses because they had separate counsel at that point. Okay. It was on March 6th that Michael Hicks filed those. I'm sorry. I'm not a scientist. I'm still at a loss to point out the thing that would have alerted Michael Hicks, the thing in the record, document, communication, that would have alerted Michael Hicks, this is something you need. There is no copyright. And the date when that – certainly before whatever this thing is, before that date, there can't be sanctions, right? Unless you say they should have found out earlier. I don't know. But what is the thing? How do we impute this to Michael Hicks? Because Michael Hicks was – Not because. I'm sorry? The thing is – the thing is – Oh, the thing – okay. The thing is – The thing is the – Preferably with a citation to the excerpts. The registration – the correspondence regarding the registration on page excerpts 211 and forward. 211. Okay. I'm going to turn to it right now. It's under a tab, right? It must be under tab 22. Under tab 16. Tab 16. 16211, did you say? Okay. I'm looking at 211 now. What is it on 211 that should have done this? This is where Mr. Barlow, who is the owner of Michael Hicks, is declaring things to the Copyright Office about two audio cassettes that were – that are the deposit copies in contradiction. That's a what? The question – I mean, what the document is. But what in the document pointed me to language or a thing that would have alerted – I would say it's the course of the correspondence between 202 and 211. You know, correspondence only matters insofar as the language conveys meaning. So I'm asking you for specific language, a thing that actually conveys a meaning. So just point me to the words and we'll see whether they're good enough. I would say the second paragraph on that page, that he's a dream being registered. This also will confirm that this is the second paragraph? Yeah, this will also confirm it. I mean, that's it, that the version of he's a dream being registered is the version sold in 1982 at concerts as per deposit of cassettes. Now the condensed version in the motion picture. Okay, and why does this convey? This conveys that what we would have sampled would not be this cassette. We would have sampled off the soundtrack. And now they're representing that to the Copyright Office. Okay, I think I understand the argument. I think you're out of time. Thank you. Sorry to interrupt. Mr. Hyman? Yes. You have about a minute left. We'll round it to a minute. Go ahead. Yes, that's the statement that was said by Mr. Besser to the Copyright Office, but the fact of the matter is that the Copyright Office, that the sound recording, that was the initial work. Whatever was put in also was a copy of that work, and they copied the sound recording. This does not demonstrate that there's another assignment, that Michael Hitz knew there was another assignment to Paramount, which defeated its rights. And this does not demonstrate, given the reports of the comparison, that they didn't infringe Michael Hitz tape. I'm kind of lost. Let me ask you sort of a big-picture question. You folks sued these people. They wound up incurring considerable attorneys' fees defending it. Correct. On the eve of the trial, you dismissed the case as sort of just as a general proposition. Why wouldn't they, in theory, be entitled to their attorneys' fees? Because, as I pointed out, the — if they were willful infringers of the sound recording and the only thing, I mean, against Magnus, yes, they're entitled to attorneys' fees against Magnus. They're not entitled to — it doesn't further the interest of the Copyright Act to award a willful infringer attorneys' fees against someone who bought it. Well, but they haven't been found to be a willful infringer. That's an allegation on your part, an allegation that you chose to dismiss. Pardon? An allegation that was not proven and you dismissed. Right. But in the attorneys' fees motion, it's presented, and there's evidence presented in the attorneys' fees motion, and there's evidence on part of MikroHITS that MikroHITS bought the copyright in good faith without — in fact, it's contrary to the interest of the Copyright Act, given that the Copyright Act says that someone 17 U.S.C. 205e, someone who purchases in good faith without knowledge, takes first if they record the assignment, which he did after the judgment. But they are infringers. He was a good faith purchaser for value. It does not advance the Copyright Act to award them fees. And the other thing — I'm really having difficulty following this argument. Forgive me. The — you claim infringement. That claim is dismissed with prejudice, meaning it is now established as a matter of law that there is no claim for infringement. So how can you bring this in through the back door on an attorneys' fees application, saying, well, even though this was dismissed with prejudice and even though we didn't appeal that in any timely fashion, now we want to re-litigate the whole question of whether there's infringement under the guise of attacking attorneys' fees? Because the unusual nature of it was that the motion was to dismiss without prejudice. Oh, well, all right. If I — that's your separate argument. But assuming for the moment that the — if the dismissal with prejudice stands. Right. Do you agree you can't then re-litigate that question? Interesting issue. The — I wrestle with it. I think the point you're making is at the time of the judgment, at the time of the judgment, can we re-litigate the question? Do you have a changed circumstance? But that's not the issue. The issue was, even at the time of the judgment, micro hits did not know and would have had reason to know of the prior assignment and bought those copyrights and got its own registration. The issue is what the Court said, and that's what we're appealing. The Court said that — the Court used the words plaintiffs, plural, blindly alleged in the complaint they owed 100 percent of the copyright. That's the Court's August 8, 2011 — Your argument two minutes ago was that we should not award attorneys' fees because it's contrary to the policy of the Copyright Act because your adversaries are really willful infringers. Not against micro hits. Against the other individual, yes, because he knew or should have known that he had sold it twice. Micro hits, who was a good-faith purchaser for value, did not know and should not have known that it had been previously sold, and therefore micro hits should not be hit with the attorney's fees because the Court's statement, plaintiffs, plural, blindly alleged they owed 100 percent. He's agreeing without first checking to ensure when micro hits did search the copyright office, did get assignments, did not see the prior assignment, had no notice of it, and no ability to know of it. Well, let me ask you a sort of flip side of the question I asked the opposing counsel. If they're represented by the same lawyer and if the one plaintiff knew or should have known — Absolutely. They certainly could ask each other. And since they're asked — since they are represented by the same lawyer, why isn't the knowledge of the one plaintiff attributed to the other plaintiff? Because that presumes the lawyer had the knowledge of what Mr. Magnus. According to micro hits, Magnus said he licensed it to the people early on. Well, known or should have known, right? And, you know, how is micro hits supposed to be on notice when the Copyright Act provides the very basis of how you put someone on notice? Paramount could have recorded the transfer. They never did. But the fact is, how is micro hits supposed to know if the co-plaintiff never tells them the truth? So — Assuming the co-plaintiff said, listen, by the way, there's an assignment. I really did assign it to Paramount years ago, and you didn't really get anything, even though you paid me and you're the administrator. And so I just want to let you know you really didn't get anything. Magnus never told micro hits he didn't get anything. Magnus — there's the assignments recorded. Magnus — there's an assignment in the record where he assigns his rights to micro hits, 50 percent of the copyright. And the other performer assigns 100 percent of her rights in the copyright. Okay. Thank you. Thank you very much, and I thank you, George. Please retire your stand for a minute.
judges: Rakoff, Kozinski, Silverman